UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DANA G. SMITH,

                Plaintiff,

v.                                          Case No.  5:06-cv-373-Oc-10GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

### ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 4) and both parties have filed briefs outlining their respective positions.  (Docs. 11 & 18.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. §405(g).

### I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on May 21, 2003, claiming a disability onset date of March 9, 2003. (R. 71-73.)  Plaintiff's application was denied initially (R. 39-40), and upon reconsideration. (R. 35-36.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 34.)  The ALJ conducted Plaintiff's administrative hearing on January 10, 2006. (R. 376-430.)   The ALJ issued a decision unfavorable to Plaintiff on February 8, 2006. (R.

14-21.)  Plaintiff timely filed a request for review with the Social Security Administration's Office of Hearings and Appeals.  (R. 360.)  On September 20, 2006 the Appeals Council denied Plaintiff's request for review and on October 16, 2006, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff was born on April 7, 1948 and was fifty-eight (58) years old at the time of the ALJ's decision. (R. 71.) Plaintiff has a ninth grade education and has worked as a security guard and process server. (R. 98, 103.) Plaintiff contends that he has been unable to work since March 9, 2003 due to diabetes, back problems, fibromyalgia, emphysema, heart problems, stroke, arthritis, and carpal tunnel syndrome. (R. 71-73, 97.)

In a letter dated April 14, 2003, Plaintiff's treating podiatrist in New York, Wayne Bodamer, D.P.M. noted that Plaintiff had been seen in his office every two months for the last seven years. (R. 193.) Dr. Bodamer wrote that Plaintiff had moderate peripheral vascular disease with chronically ingrowing toenails and some diabetic neuropathy. On May 7, 2003, Dr. Bodamer completed a "Request For Medical Information" and wrote that Plaintiff could "stand and walk to tolerance." (R. 192.)

---

[19] Wolfe at 1077-78.

[20] *See id.*

[21] *See* Doughty at 1278 n.2.

After moving from New York to Florida in 2003, Plaintiff was treated at the Florida Health Department clinics for various complaints. (R. 194-274, 333-45.)  Office notes show diagnoses of cerebrovascular disease, CAD, Hyperlipidemia, chest pain, insomnia, COPD, rectal bleeding, musculoskeletal pain, possible bipolar, sinusitis, vertigo, heart murmur, aortic stenosis, vascular disease, diarrhea, left thumb wound, aortic valve disease, shortness of breath.  (R. 194, 197, 202, 214, 219, 220, 224, 229, 231, 241, 243, 247, 263).  An October 28, 2003 office note states that Plaintiff was informed that despite his medical problems, he "maintains the ability to lead an active and productive life and is, at present, by no means 'totally and permanently disabled.'" (R. 253.)

On September 3, 2003, Plaintiff had a consultative evaluation with Edward Demmi, M.D. (R. 282-87.)  On examination, Dr. Demmi found blood pressure of 160/98, a 1/6 systolic ejection murmur, decreased range of motion of the left shoulder due to pain and impingement, soft tissue protuberance of the distal aspect of the ulna of the left forearm with decreased range of motion due to pain, grip strength of 5/5 on the right and 2/5 on the left due to pain over the distal aspect of the ulna, tenderness to palpation fo the lumbosacral area, antalgic gait favoring the right lower extremity, decreased motor strength of the right lower extremity at 4/5, decreased flexion at the waist, supine and straight leg testing were normal, and cerebellar testing was normal.  Dr. Demmi reported that a pulmonary function test performed pre-medication showed moderate obstruction with possible concomitant restriction, with FVC of 66% and FEV1 of 57% and the post-medication test revealed moderate obstruction with possible concomitant restriction, with FVC 62% and FEV1 54%. Dr. Demmi's diagnostic impression was

hypertension complicated by five myocardial infarctions, cardiac arrhythmia, and three CVA's; coronary artery disease status post cardiac catherization in 2002; cardiac arrhythmia; CVA times three; degenerative joint disease of the left shoulder; chronic obstructive pulmonary disease with abnormal pulmonary function test and current shortness of breath; unstable angina; fibromyalgia; chronic low back pain; and right distal forearm pain.

On March 9, 2004, Lawrence Field, D.O., M.B.A. performed a consultative examination. (R. 300-02.) Plaintiff reported shortness of breath, left sternal chest pain, low back pain and that he could sit for 20 minutes at a time and stand for 30 minutes at a time. The only medical record reviewed by Dr. Field was a West Marion Community Hospital Emergency Room Evaluation dated July 1, 2003.[22] On examination, Plaintiff's blood pressure was 136/76 and Dr. Field noted a 3/6 systolic ejection murmur, scattered wheeze, loss of lumbar lordosis, reduced lumbar range of motion, normal range of motion of all joints except at the right hip, grip strengths of 5/5 on the right and 3-4/5 on the left with normal fine manipulation on both sides, and negative straight leg raising. The motor exam showed muscle strength to be 5/5 except in the left upper extremity where it was 4/5. Dr. Field noted that Plaintiff was unable to heel, toe or tandem walk. Dr. Field diagnosed Plaintiff with muscle strain of the lumbar spine; chronic obstructive pulmonary disease with asthma; hypertension; chest pain, most likely costochondritis; angina history; status post cerebrovascular accident; varicose vein history;

---

[22] Plaintiff went to the Emergency Department at West Marion Community Hospital due to chest pain. (R. R.275-78.) Plaintiff refused admission to the hospital against the advice of the treating doctors.. (R. 276.)

hypercholesterolemia; morbid exogenous obesity; post-traumatic stress disorder; deconditioning; and internal derangement of the right hip. Based on his review of the records and physical examination, Dr. Field concluded that Plaintiff had no mental impairments but opined that he would be physically limited in his ability to sit, stand, walk, lift and travel for prolonged periods of time.  Dr. Field also noted that Plaintiff's utilization of his left upper extremity (his dominant side) in writing would be affected due to his previous stroke.

On May 14, 2004, Rodney A. Poetter, Ph.D. performed a consultative evaluation. Plaintiff reported prior hospitalizations for mental health issues, the most recent in 1970s. (R. 312-14.)  He reported that he had fallen out of a 22nd story of the Chrysler building in 1979 and landed on a vehicle and people, and that although he has occasional flashbacks he is "over it mainly."  Plaintiff reported that his only current problem is that "once in awhile I flip out."  Plaintiff reported taking psychotropic medications – i.e. Trazadone and Wellbutrin SR.  Dr. Poetter noted that Plaintiff had an awkward gait, carried a cane and wore a brace on his right wrist.   On examination, Plaintiff's performance suggested mild to moderate deficits in immediate memory and moderate deficits in abstract thinking.  However, he performed mental control exercises quickly and without error, which Dr. Poetter found to be inconsistent with severe concentration deficits and his responses to structured questions assessing judgment and common sense reasoning skills were 75% accurate.

Dr. Poetter noted that Plaintiff appears to have a "significant history of adjustment difficulty" and opined that the mental status examination is inconsistent with any major affective or thought disturbance but that his history and current symptoms

suggested an underlying personality disorder. Dr. Poetter noted that Plaintiff has severe deficits in reading and writing. Dr. Poetter opined that Plaintiff's symptoms are suggestive of nicotine dependence; alcohol abuse, in reported remission; (Rule Out) Learning Disorder NOS, in reading and expressive writing; and Personality Disorder NOS with paranoid and antisocial features.

There are two physical residual function capacity ("RFC") assessments of record, which were performed by non-examining state agency physicians. Nicholas H. Bancks, M.D. performed an assessment in October 2003 (R. 292-99) and Eric C. Puestow, M.D. performed a second assessment in March 2004. (304-11.) Based on their review of the medical records, Dr, Bancks and Dr. Puestow both concluded that Plaintiff could frequently lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, and walk/stand or sit for about six hours of an 8-hour workday, and push and/or pull with limitation in the upper extremities. Dr. Bancks and Dr. Puestow also found that Plaintiff had some postural and environmental limitations, and Dr. Bancks concluded that Plaintiff had limitations in handling on his left side.

James B. LeVasseur, Ph.D, a non-examining state agency psychologist, completed a Psychiatric Review Technique form and a mental RFC assessment form on May 26, 2004. (R. 315-32.). Based on his review of the medical records, LeVasseur concluded that Plaintiff has a substance addiction disorder that results in a mild restriction of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. On the RFC assessment form, LeVasseur further noted that Plaintiff was moderately limited in his ability to carry out detailed instructions, in his ability to maintain attention and

concentration for extended periods, and in his ability to respond appropriately to changes in the work setting. LeVasseur opined that "[d]espite some mild to moderate reduction in CPP and adaptation he demonstrates the mental and emotional capacity to complete simple tasks with adequate reliability."

At the hearing, Plaintiff testified that he stopped work as a security guard because he could not walk due to pains in his legs and his legs giving out. (R. 385.) In March 2003, Plaintiff moved from New York to Florida and has not worked since. (R. 390, 394.) Plaintiff testified that the pain in his legs was on average 7 out of 10 and that he was not currently taking any medication. (R. 386.) He testified that he does not know if he has any mental problems; that he has pain in his shoulders and neck; has trouble lifting his arms above his head; has lower back pain; that his hip pops out of place and he uses a cane; and that he has trouble breathing. (R. 401-04.) Plaintiff reported that he mows the grass with a riding mower, does the cooking and dishes, does some shopping using the motorized cart and cleans "maybe once a week." (R. 405-08, 413-14.) Plaintiff testified that he can walk 75 to 80 feet. (R. 409.) Plaintiff testified that his current low back pain was 4-5 out of 10 and that was "more of a constant." (R. 410.) Plaintiff testified that he can bend over and pick up the newspaper and pick coins off the table but that it is not easy to write a short note to himself. (R. 411.) Plaintiff testified that he could probably sit for one hour and stand for 5-10 minutes. (R. 411.) Plaintiff testified that a physician at the health department told him he was bipolar. (R. 414.) Plaintiff reported mood swings, daily chest pains and shortness of breath. (R. 415-18.) Plaintiff testified that he cannot close his hands and that he has constant pain due to arthritis in both of his hands. (R. 420-21.) Plaintiff

testified that he has carpal tunnel syndrome and that he can lift a gallon of milk using both hands. (R. 422.) Plaintiff testified that he cannot be a security guard because he has trouble standing up. (R. 424-25.) Vocational Expert ("VE"), Dee Dee Locascio, testified that Plaintiff's past work as a security guard and process server were both light duty jobs with an SVP of 3. (R. 428).

The ALJ determined that claimant suffers from hypertension, muscle strain of the lumbar spine, chest pains with mild coronary artery disease, shortness of breath with mild obstructive pulmonary disease, and a personality disorder (R. 16-17.) The ALJ determined that, while these impairments were severe, Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (R. 17.)

The ALJ then determined that Plaintiff retained the physical RFC to"

> lift and carry 20 pounds occasionally and 10 pounds frequently, perform simple, low stress work, with one, two or three step instructions, could sit, stand and walk for 6 hours per 8-hour workday, can perform repetitive pushing and pulling with his upper and lower extremities within the aforementioned weight restrictions, can perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching, and can occasionally balance, stoop, crouch, kneel, crawl and climb. The claimant also has depression which effects his ability to concentrate upon complex or detailed tasks but would remain capable of understanding, remembering and carrying out simple job instructions.

(R. 19-20.)

In making this determination, the ALJ accorded "great weight" to the opinion of consultative psychologist, Dr. Poetter; "some weight" to the opinion of non-examining state agency psychologist Dr. LeVasseur; "little weight" to the consultative examination by Dr. Field's; "great weight" to the two non-examining state agency physicians, Dr.

Bancks and Dr. Puestow; and noted the consultative examination by Dr. Demmi without according any weight. (R. 19-20.)

Then, the ALJ found that Plaintiff is capable of performing his past relevant work as a security guard as it is generally performed in the national economy. (R. 21.) The ALJ relied on the VE's testimony that the job is a light exertional level position with an SVP (specific vocational preparation) of three. (Id.)

## IV. DISCUSSION

### A. The ALJ's finding that Plaintiff retains the RFC to perform the exertional demands of light work is based on substantial evidence.

Plaintiff argues that the ALJ's RFC determination is not based on substantial evidence for several reasons. First, Plaintiff contends that although the ALJ accorded great weight to the opinions of the non-examining state agency physicians - Dr. Bancks and Dr. Puestow – the ALJ's RFC assessment is not consistent with the physicians' findings. Specifically, Plaintiff argues that based on the opinions of Dr. Bancks and Dr. Puestow, the ALJ should have limited Plaintiff to occasional handling.

Dr. Bancks and Dr. Puestow both found that Plaintiff is limited in his ability to push and/or pull is in his upper extremities. (R. 293, 305.) Dr. Bancks further opined that Plaintiff was limited to occasional handling with his left hand. (R. 295.) While the ALJ accorded "great weight" to the opinion of these doctors, he was not required to adopt every opinion in their assessments. Moreover, both of the doctors who performed consultative evaluations --Dr. Field and Dr. Demmi – found that Plaintiff had normal fine manipulation with both hands. (R. 287, 301.) Where the opinion of nonexamining,

12

reviewing physicians are contrary to those of the examining physicians, they are entitled to "little weight" and standing alone they do not constitute substantial evidence.[23]

Plaintiff also argues that the reports of the consultative physicians – Dr. Field and Dr. Demmi – do not support the ALJ's finding that Plaintiff can perform the six hours of standing and walking required for light work. Dr. Field opined that "prolonged sitting, prolonged standing, walking, lifting, and traveling, would all be affected." (R. 302.) The ALJ accorded "little weight" to Dr. Field's assessment due to the "inconsistency of his own finding with his opinions." This conclusion is supported by substantial record evidence. On examination, Dr. Field found a normal range of motion in all of Plaintiff's major joints of the extremities except for the right hip; Plaintiff's straight leg raising was negative; and although Plaintiff had a limp, he was able to ambulate without the use of an assistive device.

However, even if the ALJ had accorded Dr. Field's opinion more weight, Dr. Field's opinion does not necessarily support a finding that Plaintiff cannot perform the six hours of standing and walking required for light work. Indeed, Dr. Field merely opined that prolonged standing and walking would be "affected", without providing any opinion as to how, or to what extent, they would be affected. [24]

Plaintiff also argues that Dr. Demmi's findings "would impact [Plaintiff's] ability to perform the standing and walking entailed in the performance of light work." However, although Dr. Demmi noted that Plaintiff's gait was antalgic, he found that Plaintiff could

---

[23] Sharfarz v. Bowen, 825 F.2d 278, 2890 (11th Cir. 1987.)

[24] Likewise, Dr. Bodamer's note that Plaintiff could "stand and walk to tolerance" does not necessarily support a conclusion that Plaintiff could not perform light work. (R. 192.)

walk without an assistive device. (R. 285.) Moreover, it is unclear what impact, if any, Dr. Demmi's findings might have on Plaintiff's ability to stand or walk because Dr. Demmi did not discuss any such limitations in his "functional assessment." Indeed, Plaintiff has failed to even suggest how Dr. Demmi's findings would limit Plaintiff's ability to stand or walk.

Lastly, Plaintiff argues that the ALJ's finding that Plaintiff's sole mental functional limitation is a limitation to "simple, low stress work, with one, two or three step instructions" is inconsistent with the reports of both Dr. Poetter (who performed a consultative evaluation) and Dr. LeVasseru ( a non-examining state agency psychologist).

Turning first to Dr. Poetter, he found that Plaintiff had mild to moderate deficits in immediate memory and moderate deficits in abstract thinking. (R. 313.) However, he also concluded that Plaintiff's performance on mental control exercises was inconsistent with severe concentration deficits and his responses to structured questions assessing judgment and common sense reasoning skills were 75% accurate. (R. 313-14.) Dr. LeVasseur concluded that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace, and was moderately limited in his ability to carry out detailed instructions, in his ability to maintain attention and concentration for extended periods, and in his ability to respond appropriately to changes in the work setting. (R. 325-330.) However, Dr. LeVasseur specifically found that "[d]espite some mild to moderate reduction in CPP and adaptation he demonstrates the mental and emotional capacity to complete simple tasks with adequate reliability." (R. 331.) These findings are consistent with the ALJ's finding that Plaintiff is limited to "simple, low stress work,

with one, two or three step instructions."  Moreover, Plaintiff has failed to even suggest what additional mental limitations the ALJ should have included in his RFC finding.

Accordingly, for the reasons discussed above, the ALJ's RFC finding is supported by substantial record evidence.

### B.    The ALJ's Erred In Finding That Plaintiff Could Perform His Past Relevant Work As A Security Guard

The ALJ found that Plaintiff could perform his past relevant work as a security guard.  In reaching this conclusion, the ALJ relied on the Vocational Expert's testimony that the Plaintiff's past work as a security guard was performed by Plaintiff as generally performed in the national economy and that the position is a light exertional level position with a SVP of three.

Plaintiff argues that the ALJ's RFC finding is incompatible with the reasoning requirements for the job of security guard.  According to the Dictionary of Occupational Titles ("DOT"), a security guard is required to have level three reasoning, which is defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations."[25]  A reasoning level of

---

[25] See Doc. 11, Exhibit A.   At the hearing, the VE mentioned the SVP level, but not the reasoning level.  The SVP level in a DOT listing does not address whether a job entails only simple job instructions. Instead the General Educational Development ("GED") requirements in the DOT listing (such as reasoning) are more pertinent to determining the complexity of a job.  See e.g., Estrada v. Barnhart, 417 F.Supp.2d 1299, n.3 (M.D. Fla. 2006); Hall-Grover v. Barnhart, 2004 WL 1529283 *3-4 (D. Me. 2004).

15

two, or higher, assumes that the applicant is capable of more than simple or repetitive tasks.[26]

Here, the ALJ concluded that Plaintiff could perform simple, low stress work, with one, two or three step instructions and that Plaintiff was capable of understanding, remembering and carrying out simple job instructions. There is an apparent conflict between the limitation in Plaintiff's RFC to simple, low stress work, with one, two or three step instructions and the level-three reasoning required to perform Plaintiff's past work as a security guard. Because of this conflict the ALJ's finding that Plaintiff can perform his past relevant work as generally performed in the national economy is not supported by the substantial evidence and, therefore, must be reversed.

Accordingly, the ALJ's decision is due to be remanded for the ALJ to reevaluate whether Plaintiff can perform his past relevant work based on his RFC, and if not, to consider at step five of the sequential analysis whether Plaintiff can perform other work that exists in the national economy.[27]

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner, for an Administrative Law Judge to: (1) reevaluate whether Plaintiff can

---

[26] See Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997);. Hall-Grover v. Barnhart, 2004 WL 1529283 (D. Me. 2004.); Mead v. Barnhart, 2004 WL 2580744, * 2 (D.N.H. 2004).

[27] Based on this conclusion, the Court need not address Plaintiff's alternative argument that the ALJ failed to adequately discuss the duties associated with Plaintiff's past work or the basis for finding that Plaintiff can return to work.

perform his past relevant work based on his RFC; (2) if appropriate, consider at step five whether Plaintiff can perform other work that exists in the national economy; and (3) conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment in favor of the Plaintiff consistent with this Order and to close the file

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 28, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
   All Counsel